UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MINTEL LEARNING TECHNOLOGY, INC.,
a California corporation,

    Plaintiff,

    v.

BEIJING KAIDI EDUCATION & TECHNOLOGY DEVELOPMENT CO., LTD., dba, KAIDISOFT, a Chinese Corporation, YALIN LIN, an individual, YAN LIU, an individual, JUN ZHANG, an individual, and DOES 1-10,

    Defendants.
_____/

No. C 06-7541 PJH

**ORDER DENYING MOTION TO DISMISS**

Defendants Beijing Kaidi Education & Technology Development Co., Ltd. (dba Kaidisoft – "Kaidi"), Yalin Lin ("Lin"), Yan Liu ("Liu"), and Jun Zhang ("Zhang") seek an order dismissing the claims asserted against Lin for insufficiency of service of process; for lack of personal jurisdiction as to Lin and Kaidi, pursuant to Federal Rule of Civil Procedure 12(b)(2); and on the ground of *forum non conveniens*, pursuant to Federal Rule of Civil Procedure 12(b)(5). Having read the parties' papers and declarations and having carefully considered their arguments and the relevant legal authority, the court DENIES the motion for the reasons set forth below.

**BACKGROUND**

Plaintiff Mintel Learning Technology, Inc. ("Mintel") is a California corporation. Mintel brought this case originally against Kaidi, a Chinese corporation, and Lin, Kaidi's CEO, alleging copyright infringement, misappropriation of trade secrets, breach of contract, false advertisement, civil conspiracy, and unfair competition. On March 28, 2007, this court issued an order granting Lin's motion to quash for ineffective service of process. Mintel filed an amended complaint adding defendants Liu, Lin's daughter, and

1  Zhang, Liu's husband, to the suit on March 16, 2007.  Both Liu and Zhang are residents
2  of Oakland, California.

## DISCUSSION

4  A.     Motion to Dismiss for Insufficiency of Service[1]

5        Defendants move to dismiss this suit as to Lin, alleging that Mintel failed to
6  properly serve her with the summons and complaint.

7        Federal Rule of Civil Procedure 4 allows service "pursuant to the law of the state
8  in which the district court is located." Fed. R. Civ. P. 4(e)(1). Strict compliance is
9  required with the rules governing manner of service. Schwarzer, Tashima & Wagstaffe,
10 Federal Civil Procedure Before Trial (2006) § 5:165. The more liberal rules applicable
11 to defects in the form of summons do not apply to defects in service. Id.

12       Where validity of service is contested by a motion under Federal Rules of Civil
13 Procedure 12, the burden is on the plaintiff to establish that service was effective. Id. §
14 9:149. That return is generally accepted as prima facie evidence that service was
15 effected, and of the manner in which it was effected. Id. Unless some defect in service
16 is shown on the face of the return, a motion to dismiss under Rule 12(b)(5) requires the
17 defendant to produce affidavits, discovery materials, or other admissible evidence
18 establishing the lack of proper service. Id. § 9:150. In response, the plaintiff must
19 provide evidence showing that the service was proper, or creating an issue of fact
20 requiring an evidentiary hearing to resolve. Id. § 9:151. If a Rule 12(b)(5) motion is
21 granted, the court may dismiss the action or retain the action and simply quash the
22 service. Id. § 9:153.

23       The parties dispute whether Lin was properly served with process. On May 14,
24 2007, Lin was at San Francisco International Airport ("SFO"), preparing to board a
25 plane. Lin, who allegedly does not speak English, states in her declaration that a

---

[1] According to Mintel, Kaidi has not yet been served in China. Service is expected to take from six months to one year (from April 2007) to complete.

- 2 -

"strange Asian man" in his 30s jumped in front of her while she was waiting to pass through the security check, said something unclearly very fast, and tried to hand over to her a "vanilla package." When Lin refused to accept the package, the man "angrily threw the package on the airport floor and ran away in a rush." Airport security personnel later retrieved the package.

Mintel asserts a different factual scenario, supported by declarations from Wayne Yang ("Yang"), Mintel's former President and CTO, and Terry Tsai ("Tsai"), the process server. Mintel contends that on May 14, 2007, Yang and Tsai went to the airport after Yang learned that Lin would be traveling from SFO that day. Yang pointed out Lin to Tsai, and Yang and Tsai approached Lin. Tsai then clearly asked Lin in Mandarin Chinese "Are you Ms. Yalin Lin?" Yang and Tsai both attest that Lin replied affirmatively. However, when Tsai clearly said "This is Mintel's complaint against you and Kaidi," Lin immediately put her hands behind her and backed away. Lin's husband allegedly reached out to take the envelope while inquiring "Mintel's complaint?" However, Lin stopped her husband. Tsai placed the envelope on Lin's arm, but Lin let it drop. Yang and Tsai then left the scene.

Where a defendant attempts to evade service by refusing to accept service of process, it is usually sufficient for the process server to "touch" the party to be served with papers and leave them in the defendant's presence. Wright and Miller, Federal Practice and Procedure, Civil, 3d., § 1095. Where the server is in close proximity to the defendant, clearly communicates intent to serve court documents, and makes reasonable efforts to leave the papers, service is sufficient. See Errion v. Connell, 236 F.2d 447, 457 (9th Cir. 1956) (service sufficient when sheriff pitched the papers through a hole in defendant's screen door after she spoke with him and ducked behind a door to avoid service). The key question is whether service of process was "reasonably calculated, under all circumstances, to apprise [the] interested parties of the pendency of the action." Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).

As indicated above, both sides rely on personal declarations and affidavits to

- 3 -

support their differing accounts of the airport service on May 14, 2007. Lin maintains that Tsai's communication was unclear and that she did not understand what he was trying to give her. As such, she refused the papers. One factor that weighs in favor of Lin's claim is that the delivery of a package at the airport by a complete stranger may objectively be alarming. Defendants refer to the U.S. Transportation Security Administration ("TSA") Security Guidelines as well as SFO's Airline Security Guidelines which essentially warn all passengers to not accept packages from any stranger. They contend that in light of September 11, 2001, which has inculcated such warnings into the minds of most people, Lin's refusal of service was reasonable.

By Tsai's declaration, he is a native Chinese speaker and works as a process server. He states that he attempted to hand Lin the package only after first ascertaining that she was in fact the defendant, Yalin Lin. The court finds that Mintel's account of the events is more credible than defendants' claim that Lin could not understand Tsai. The likelihood that a process server that speaks native Mandarin would not be able to intelligibly utter the sentence "This is Mintel's complaint against you and Kaidi," is low. Moreover, in view of the history of failed service on Lin, it is unlikely that Yang, fully aware of the situation and fluent in Mandarin, would hire a process server that could not speak Mandarin well enough to convey the basic message. Since there is no dispute that Tsai was in close proximity and that he made reasonable efforts to leave the papers, Mintel satisfied the requirements for proper service. Errion, 236 F.2d at 457.

Defendants suggest that this court should, for public policy reasons, invalidate service of process at an airport because of the heightened security measures enacted since September 11, 2001. Defendants reason that given the numerous security and safety warnings advising travelers to refuse to accept packages at airports, an ordinary, reasonable passenger in the same situation as Lin would have done the same. Setting policy is not, however, the role of the court, but rather the role of the legislature. The court finds service was proper under California law.

1
2
    Accordingly, the court finds that defendants' motion to dismiss the claims against Lin for insufficient service of process must be DENIED.

3
B.    Motion to Dismiss for Lack of Personal Jurisdiction

4
5
6
7
    Defendants do not dispute that this court has personal jurisdiction over Liu and Zhang, both of whom are residents of Oakland, California. However, pursuant to Federal Rule of Civil Procedure 12(b)(2), defendants argue that Kaidi and Lin should be dismissed from the action for lack of personal jurisdiction.

8
9
10
11
12
13
14
15
16
17
18
19
20
    Where a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. Rio Properties, Inc. v. Rio Int'l Interlink, 284 F.3d 1007, 1019 (9th Cir. 2002). If the motion, as in the present case, is based on written materials rather than on an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 800 (9th Cir. 2004). In such cases, the court requires only that the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction. Id. Conflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor. AT&T v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th Cir. 1996); see Bancroft & Masters, Inc. v. August Nat'l, Inc., 223 F.3d 1082, 1087 (9th Cir. 2000) ("Because the prima facie jurisdictional analysis requires us to accept the plaintiffs allegations as true, we must adopt [the plaintiff's] version of events for purposes of this appeal.").

21
22
23
24
25
26
27
    For this court to exercise personal jurisdiction over a defendant, that defendant must have sufficient "minimum contacts" with the relevant forum such that the exercise of personal jurisdiction "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). Since California's long-arm jurisdictional statute is coextensive with federal due process requirements, this court may exercise jurisdiction on any basis not inconsistent with the state or federal Constitution. Cal. Civ. Proc. Code § 410.10.

28

- 5 -

1. General Jurisdiction

Personal jurisdiction over a non-resident of the forum state can be either "general" or "specific." If a defendant is either domiciled in the forum state, or if its activities there are "substantial, continuous, and systematic," a federal court (if permitted by the state's "long arm" statute) may exercise jurisdiction over any cause of action, even ones unrelated to the defendant's activities in the state. Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 445 (1952). This is referred to as "general jurisdiction."

Mintel does not assert that either Kaidi's or Lin's contacts are sufficiently "substantial, continuous, and systematic" to confer general jurisdiction. However, there is some dispute with respect to Lin's status as a resident. Mintel has challenged Lin to affirmatively state under oath whether she has a California driver's license, and if so, what home address is listed on it; whether she is a permanent resident of the U.S., and if so, what mailing address is listed on her green card for communications with the government; and what address she uses for tax filings. Additionally, Mintel submits a declaration from Yang, the company's co-founder, that Lin indicated to him she had a home in Oakland, even using the address to receive mail during negotiations. Lin has not filed a reply with respect to her status. By way of a prior declaration, Lin maintains that she lives in China, only visiting the United States occasionally, and that her permanent residence status has been invalid since since February 16, 2006.

Nonetheless, because the plaintiff bears the burden of proof of demonstrating jurisdiction, and because conflicting statements are resolved in the plaintiff's favor, Mintel has arguably established a prima facie case of general jurisdiction over Lin. Rio Properties, 284 F.3d at 1019; Bancroft, 223 F.3d at 1087.

2. Specific Jurisdiction

If a non-resident's contacts with the forum state are not sufficiently "continuous and systematic" and he is not a resident, that defendant may still be subject to "specific jurisdiction" on claims related to its activities or contacts in the forum. Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme, 433 F.3d 1199, 1205 (9th Cir. 2006). In

- 6 -

assessing specific jurisdiction, the Ninth Circuit uses a three-prong test to determine if "minimum contacts" exist:

> (1) the nonresident defendant must *purposefully direct* his activities or consummate some transaction within the forum or resident thereof; or perform some act by which he *purposefully avails* himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which *arises out of or relates to* the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must be *reasonable*.

Schwarzenegger, 374 F.3d at 802. (emphasis added). If the plaintiff succeeds in satisfying both of the first two prongs, the burden shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. Burger King Corp v. Rudzewicz, 471 U.S. 462, 476-78 (1985). If all elements are not met, jurisdiction in the forum would deprive the defendant of due process of law. See Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1155 (9th Cir. 2006).

The first prong encompasses two distinguishable concepts - true "purposeful availment" and "purposeful direction." Schwarzenegger, 374 F.3d at 802. The former typically applies to suits "sounding in contract," while the latter to suits "sounding in tort." Id. Establishing either element satisfies the first prong of the specific jurisdiction test. Id.

Defendants claim that this court lacks specific jurisdiction over both Kaidi and Lin. Kaidi contends that Lin's single act of signing an agreement in California, on its behalf, does not give rise to specific jurisdiction. Kaidi asserts that it has no place of business in, does not advertise in, and does not solicit business in the U.S. Moreover, Kaidi alludes to the fact that the subject of this dispute, the first Collaboration Agreement between the parties, was actually performed in China, as were two subsequent agreements between the parties.

Mintel counters that the consummation of the Collaboration Agreement in California, irrespective of where it was performed, suffices for this court to have specific jurisdiction. Mintel points to Lin's multiple trips to California during negotiations for the

- 7 -

contract as evidence of defendants' seeking the benefits and protections of this state. Further, Mintel asserts specific jurisdiction exists because the actual terms of the final agreement allowed Kaidi to access a product developed in the forum, protected by its laws.

Because the amended complaint indicates that this is, among other things, a breach of contract claim, "purposeful availment" analysis is relevant here. "Purposeful availment" typically entails consummation of an action or transaction, taking place in the forum, commonly through execution of a contract. Schwarzenegger, 374 F.3d at 802. By taking such action, a defendant "purposefully avails" himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of the forum state's laws. Burger King, 471 U.S. at 475. In exchange, a defendant must, as a quid pro quo, submit to the jurisdiction of the state's courts should litigation arise. Schwarzenegger, 374 F.3d at 802.

The purposeful availment requirement is met if the defendant performs "some type of affirmative conduct which allows or promotes the transaction of business within the forum state." Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990). However, the mere existence of a contract does not necessarily constitute sufficient minimum contacts for jurisdiction. Burger King, 471 U.S. at 478. Rather, a court must look to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing to determine if the defendant's contacts are 'substantial' and not merely 'random, fortuitous, or attenuated.'" Id. at 479, 480 (internal quotations omitted).

While the single, independent act of signing a contract does not automatically confer jurisdiction, Lin's actions on behalf of Kaidi meet the minimum contacts test. Both sides agree that a Collaboration Agreement was signed on August 14, 2002 between Kaidi and Mintel in Fremont, California. Furthermore, defendants do not dispute that before signing on behalf of Kaidi, Lin visited California several times to negotiate the agreement. While the terms of the agreement indicated that Mintel China would execute

- 8 -

the deal, it is clear Mintel USA, a California corporation, was the counter-party to the agreement.  Since the terms of the agreement dictated obligations for both parties, and granted Kaidi access to a product developed in this forum, the Collaboration Agreement is governed and protected by California law.  As such, in the event of a dispute with Mintel, Kaidi would be able to seek recourse in California courts; in exchange for this benefit and protection, they have submitted to the jurisdiction of this forum's courts.

In addition to availing itself of the protections of the courts, Kaidi, through its CEO Lin, affirmatively acted to promote the transaction of business in California.  Under the agreement, it is evident that Mintel was obligated to continue to provide "patent-pending products and technical support" while hosting, maintaining, and upgrading the products and services.  Moreover, Mintel was required to give "final approval" before Kaidi could release any marketing/sales material to the public.  It is clear that by forming a cooperative business relationship, the parties did not intend for the contract to govern only a single transaction, but rather to create a distributorship relationship.  The framing of such terms constitutes affirmative conduct which allows and promotes business transactions in California, meeting the purposeful availment requirement.  Sher, 911 F.2d at 1362.

In Burger King, the Supreme Court noted that the simple existence of a contract was not sufficient to warrant jurisdiction, cautioning against random, fortuitous, or attenuated contacts not substantial enough to constitute "minimum contacts.  471 U.S. at 478.  The Court explicated that prior negotiations, contemplated future consequences, terms of the contract, and the parties actual course of dealing were to be considered in determining if contacts were "substantial."  Id.  The defendants here contend that the single Collaboration Agreement is a random, fortuitous, and attenuated contact, in light of the fact that Kaidi has no place of business in California, nor does it advertise or solicit business here.

However, the terms of the Collaboration Agreement make it clear that the contract meets the "purposeful availment" test.  Term 2.2 of the agreement requires that Kaidi

provide Mintel with a timetable of how and when to distribute Mintel products. Terms 2.3 to 2.5 define clear metrics for the progression of the relationship with target market penetration goals and dates. Term 2.7 directs that if the business relationship is strong, then Mintel and Kaidi will later jointly develop a customer base, with the latter getting increased deal-making authority. There is even a clause in the Collaboration Agreement that raises the possibility of exclusive distribution rights if Kaidi meets its market share goals.

None of these terms indicate that the relationship was random, fortuitous, or attenuated. Rather, the terms of the contract appear to have been the product of prior deliberations between the parties, with some assumption that the business relationship would continue for at least 5 years. Id. Moreover, the listing of performance metrics points to the "contemplated future consequences," of meeting or failing the market share goals. A balancing of the terms indicates that jurisdiction over Kaidi would not be based on a random, isolated business transaction, but a substantial contact with the forum state.

In its opposition, Mintel further asserts that Kaidi and Lin have also "purposefully directed" their actions to the forum state such that this court has specific jurisdiction over them.[2]

In tort cases, courts in the Ninth Circuit inquire whether a defendant "purposefully directs" his activities at the forum. Yahoo!, 433 F.3d at 1206. This requires applying an "effects test" which focuses on the forum where defendant's actions are felt, irrespective of whether the actions occur within that forum. Id. The "effects test" requires that the plaintiff allege the defendant (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state. Dole Food Co. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002).

Aside from breach of contract, Mintel's amended complaint alleges that Lin and

---

[2] Defendants did not file a reply and did not discuss "purposeful direction" in their motion to dismiss.

- 10 -

Kaidi conspired with Mintel's former CEO to undermine Mintel's market in China, knowing it would have a detrimental effect on the well-being of the company, its employees, and its shareholders in California.

The court finds that Mintel made its requisite prima facie showing in its opposition by alleging the elements of "purposeful direction." Mintel alleges that Kaidi and Lin misappropriated its trade secrets and that Lin diluted Mintel's profit share through illicit amendments. Mintel also alleges that these intentional acts were intended to undermine Mintel and that the defendants knew their acts would cause harm likely to be suffered in California, where Mintel is incorporated. Thus, the first prong of the specific jurisdiction test is met.

Defendants do not dispute that Mintel's claim "arises out of or relates" to their forum related activities, satisfying the second prong. The Ninth Circuit applies a "but-for" test to determine whether a particular claim arises out of or is related to forum-related activities. Ballard v. Savage, 65 F.3d 1495, 1500 (9th Cir. 1995); see also Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1123 (9th Cir. 2002). Both the amended complaint and the opposition filed by Mintel alleges that "but for" the Collaboration Agreement, none of its injuries would have occurred. This is sufficient to make a prima facie showing of jurisdictional facts. Schwarzenegger, 374 F.3d at 800.

If the plaintiff succeeds in satisfying the first two prongs, the burden shifts to the defendant to "present a compelling case" that the exercise of jurisdiction would not be reasonable. Burger King, 471 U.S. at 476-78. Mintel has satisfied the first and second prongs of the specific jurisdiction test, shifting the burden to defendants. However, defendants are silent on this matter. Thus, it is appropriate for this court to exercise specific jurisdiction over Kaidi and Lin, based on theories of purposeful availment and purposeful direction. Accordingly, the court DENIES defendant's motion to dismiss for lack of personal jurisdiction.

C.  Motion to Dismiss for *Forum Non Conveniens*

Defendants contend that this court should dismiss the suit on the ground of *forum non conveniens* because the case can be more conveniently and adequately adjudicated in the People's Republic of China ("China").

*Forum non conveniens* is a nonmerits ground for dismissal. See American Dredging Co. v. Miller, 510 U.S. 443, 447-448 (1994). Since there is no mandatory sequencing of nonmerits issues, a district court has leeway to "choose among threshold grounds for denying audience to a case on the merits." Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999). Thus, where considerations of convenience, fairness, and judicial economy warrant it, a district court may dispose of an action through a *forum non conveniens* dismissal, bypassing consideration of subject-matter and personal jurisdiction. Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 127 S.Ct. 1184, 1190-1193 (2007).

A party moving to dismiss based on *forum non conveniens* bears a heavy burden of showing (1) that there is an adequate alternative forum, and (2) that the balance of public and private interest factors favor dismissal of suit. Lueck v. Sundstrand Corp., 236 F.3d 1137, 1142-43 (9th Cir. 2001). Unless the balance of "private interest" and "public interest" factors *strongly favors* trial in the foreign country, a plaintiff's choice of forum will not be disturbed. See Gates Learjet Corp. v. Jensen, 743 F.2d 1325, 1334 (9th Cir. 1984). The standard to be applied for a motion to dismiss on the ground of *forum non conveniens* is whether the defendants have made a clear showing of facts which establish that trial in the chosen forum would "establish such oppression and vexation of a defendant as to be out of proportion to plaintiff's convenience." American Dredging, 510 U.S. at 447-48. *Forum non conveniens* is an "exceptional tool to be employed sparingly, [not a] . . . doctrine that compels plaintiffs to choose the optimal forum for their claim." Dole Food Co., 303 F.3d at 1118 (quoting Ravelo Monegro v. Rosa, 211 F.3d 509, 514 (9th Cir. 2000)).

1. Adequate Alternative Forum

An adequate, alternative forum ordinarily exists when defendants are amenable to service of process in the foreign forum. Lueck, 236 F.3d at 1143. A foreign forum is adequate when it provides plaintiff with a "sufficient remedy for his wrong." Id.

Defendants contend that China is an adequate alternative forum because it has civil procedures as well as contract, copyright, trademark, and patent laws to properly adjudicate the claims. Defendants also point out that Kaidi's trademark is registered with the Chinese Trademark Office and that the Chinese Copyright Office issued to Kaidi a Registration Certification for Author's Rights in Computer Software (No. 023041) for "Min-Te Intelligent Memory Engine v 1.0."

Despite this, defendants still fail to meet their burden of proving that China is an adequate alternative forum for all parties. Kaidi does not offer any proof as to the existence of the contract, copyright, trademark, and patent laws in China which would provide the plaintiff a sufficient remedy for his wrong. Also, defendants cite to no Chinese laws that would govern Count Two (trade secret misappropriation), Count Three (false advertisement), and Count Six (civil conspiracy) of Mintel's amended complaint. Thus, defendants have proffered no support for their claim that China would be able to provide effective redress for the alleged harms Mintel suffered, and half of the claims defendants do not address at all. Given the heavy burden imposed on the moving party, defendants have not made a sufficient showing that China qualifies as an alternative forum to California.

2. Private Interest Factors

In assessing whether to dismiss on the ground of *forum non conveniens*, the court should also consider the private interests of the parties - ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses, and cost of obtaining attendance of willing witnesses; and likelihood of a fair trial, including any practical problems that make trial of a case easy, expeditious and inexpensive. See Gulf

Oil v. Gilbert, 330 U.S. 501, 508 (1947).

Defendants posit that these private factors weigh in favor of dismissal of the suit in California. In arguing that China is a more convenient forum, defendants point out that the Collaboration Agreement (and all subsequent agreements) were ultimately carried out in China, that the hardware systems and those involved in software development are in China, and that both the former CEO and CFO of Mintel have residences in China. Defendants also note that all Kaidi employees, including Lin, reside in China and that all the parties involved speak Chinese and were not educated in the United States. Additionally, defendants claim that maintenance of jurisdiction by this court would increase related costs, stemming from translation, interpretation, notarization, visa application, and travel.

With respect to ease of access to sources of proof, both sides dispute where the majority of evidence lies. However, as defendants bear the heavy burden of proof on this issue, their showing is particularly important. The essence of defendants' argument is that the bulk of their witnesses reside and work in China. Defendants don't specifically aruge, but the court assumes that because Kaidi is based in China, its employees, systems, and distributorship-related proof would be there as well. On the other hand, because Mintel is based in California, all of its witnesses and documents relating to the production and issuance of the technology are in California. Furthermore, though the execution of the Collaboration Agreement took place in China, the document on its face explicitly states that the signing and initiation of the contract took place in California. Thus, witnesses to the negotiation and agreement are likely located in both forums. Given the limited explanation offered, however, the court finds that Kaidi has failed to carry its burden of proof that a Chinese court would have significantly easier access to the likely evidence.

Kaidi does not argue as to the availability of compulsory process for attendance of unwilling witnesses. However, Mintel contends that it has no available means of compelling its former CEO, James Liu ("Mr. Liu"), to attend a trial in China. Mintel's

amended complaint asserts that Mr. Liu conspired with Lin to undermine Mintel's profit sharing under the Collaboration Agreement by signing unauthorized, supplemental agreements after the original.  Subsequently, Mr. Liu was ousted from the company by the board of directors.  Given this, Mr. Liu is a witness whose testimony may prove integral to adjudication of Mintel's claims.  Moreover, though Mr. Liu may have a residence in China, it appears his permanent residence is in Fremont, California.  As such, Mr. Liu cannot be compelled to testify if the trial takes place in China.  Furthermore, Lin's daughter, Liu, and Lin's son-in-law, Zhang, are both named defendants and residents of California, and it is unlikely that they could be haled into a Chinese court.  On balance, the factor of compulsory process of California residents favors suit in this forum.

With respect to the cost of obtaining attendance of willing witnesses and any problems that would interfere with a fair trial, neither side offers persuasive evidence that either factor weighs for them.  The cost of transporting friendly witnesses would be generally the same for both parties, whether the trial took place in California or China.  Neither Kaidi nor Mintel has argued that trial in its forum would be less costly in terms of transporting friendly witnesses, nor have they quantified exactly how many friendly witnesses even exist.  While defendants contend that adjudication in China would be most cost-effective, this has little bearing on the ultimate fairness of the trial.  Translation, interpretation, and notarization costs would have to be borne by both sides, so neither has an advantage.

Also, even if defendants could show that they would incur more in international travel expenses by transporting witnesses to California, than Mintel would transporting its witnesses to China, the standard in this circuit is not that an "optimal forum be chosen" for the defendant.  Dole Food, 303 F.3d at 1118.  Rather, the defendants must make a clear showing that trial in California would "establish such oppression and vexation" on them that it would be out of proportion to Mintel's convenience.  American Dredging, 510 U.S. at 447-48.  Given the negligible amount of evidence presented, the defendants

have not established that the cost of travel, the only potential source of oppression cited, could reach a degree so disproportionate as to be unfair to Kaidi, Lin, Liu, and Zhang.

On balance, the balance of private interests does not support the defendants' *forum non conveniens* claim.

3.   Public Interest Factors

Public interest factors include court congestion, local interest in resolving the controversy, and preference for having a forum apply a law with which it is familiar. See Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764, 771 (9th Cir. 1991).

Defendants contend that Mintel and Kaidi signed a supplemental agreement to the Collaboration Agreement which contained a "choice of law" provision that stipulated governance by Chinese laws. They also take the position that Mintel's copyright and unfair competition claims are governed by Chinese laws because Kaidi's copyright and trademark registrations are held with Chinese authorities. Moreover, the defendants assert that citizens of California would be unfairly burdened by jury duty if forced to hear a dispute arising from activities conducted in China, by Chinese companies, involving mostly Chinese citizens.

First, court congestion is a neutral factor. Neither side presents evidence that court congestion is actually an issue in this forum; nor is evidence proffered that the proposed alternative forum is less congested. The issue is not whether dismissal will reduce congestion in California, but whether a trial will be quicker in China because its docket is less crowded. See Starnes v. McGuire, 512 F.2d 918, 932 (D.C. Cir. 1974). Nothing indicates it would be. Furthermore, that *most* of the parties involved are Chinese does not mean that adjudication will necessarily clog the courts even more, where the plaintiff is itself a California corporation.

Second, the local interest in resolving a local controversy at home weighs heavily in favor of California as the place of trial. A forum has a significant interest in protecting the intellectual property of its citizens and businesses from infringement by foreign defendants. Integral Development Corp. v. Weissenbach, 122 Cal. Rptr. 2d 24, 36 (Ct.

- 16 -

App. 2002) ("The enactment of the Uniform Trade Secrets Act in California indicates a strong legislative intent to protect California residents against the misappropriation of their trade secrets"); see also Gates Learjet, 743 F.2d at 1336 ("Arizona has an interest in protecting its companies from trademark infringement abroad to preserve the state's economic vitality").  Because Mintel alleges harms committed against it by foreign defendants, California has an interest in adjudicating the matter.

Moreover, the questionable choice of law clause which defendants allege supplements the original agreement matters little with regard to California's compelling interest in defending its citizens.  Since Mintel is the plaintiff seeking redress and a citizen of the forum state, California's interest in resolving the dispute is stronger than China's interest.  Conversely, if Kaidi were the plaintiff, China's courts could arguably have a greater local interest.  However, since that is not the case here, this factor weighs toward trial in this forum.

Third, in the Ninth Circuit, public interest factors dictate a preference for having a forum apply a law with which it is familiar.  Lockman, 930 F.2d at 771.  Here, the defendants claim Chinese and U.S. law will conflict in resolving the copyright infringement and unfair competition claims because Kaidi's copyright and trademark registrations are with the Chinese government.  At best, this is an argument that this court would not be familiar with those issues.  However, such a claim ignores the fact that the basis for Mintel's complaint derives from the defendants' breach of the original Collaboration Agreement.

Moreover, the crux of the issue here is Mintel's allegation that the defendants violated U.S. copyright law.  This matter would necessarily be out of the purview of a Chinese court.  In their motion, defendants assert by way of their factual background that Mintel is actually infringing on Kaidi's trademark and copyrights under Chinese law.  However, there is no counterclaim and any infringement by Mintel is not a part of this lawsuit.  The issue raised by Mintel's lawsuit is whether Kaidi caused the harms alleged

in the amended complaint. This court would clearly be familiar with the relevant state or federal law pertinent to the pending claims.

Since the balance of public interest factors here also does not strongly favor dismissal of the suit, Mintel's choice of this forum should not be disturbed. Defendants have not proved that China would be an adequate alternative forum, nor have they shown that private interest factors weigh heavily towards dismissal. Since defendants have not made a clear factual showing that indicates oppression and vexation out of proportion with Mintel's convenience, this court should adjudicate this matter to protect the interests of its citizens. As such, the court DENIES defendants' motion to dismiss on the grounds of *forum non conveniens.*

## CONCLUSION

For the reasons set forth above, defendants' motion for dismissal for insufficient service of process, for lack of personal jurisdiction, and on the grounds of *forum non conveniens* is DENIED. The court finds that Mintel properly served Lin at SFO, as her factual account was not credible. Moreover, the court finds it has personal jurisdiction over both Lin and Kaidi. Finally, since defendants have failed to meet their burden of proof to warrant dismissal for *forum non conveniens*, the court holds that California is the proper forum for adjudicating this suit.

**IT IS SO ORDERED.**

Dated: August 20, 2007

_____
PHYLLIS J. HAMILTON
United States District Judge